. [Reid v. Bank of Mobile.]

# Reid *v.* Bank of Mobile.

*Bill in Equity to enforce Trust in Railroad Bonds, against Purchaser from Trustee.*

1. *Trust created by verbal agreement and deposit of bonds.*—A valid trust may be created, by and in favor of the makers of a promissory note executed in aid of a railroad company, by their deposit of bonds of the company with one of their number, under a verbal agreement that the bonds shall be held by him for the protection and security of the makers against liability on the note, their respective interests in the bonds being proportionate with their agreed liability on the note as between themselves.

2. *Same; conversion of bonds by trustee; remedy of cestuis que trust.* If the trustee, while so holding such bonds, appropriates them to the payment of his individual debts, or the debts of a partnership of which he is a member, or pledges them as collateral security for such debts; this is a violation of the trust, and a wrongful conversion, which renders him chargeable, at the suit of the beneficiaries, with the value of the bonds at the time of the conversion; and the beneficiaries may also pursue and recover the bonds, or their proceeds if changed, in the hands of all persons except a purchaser for valuable consideration without notice; and even in the hands of such a purchaser, if the bonds are not negotiable paper.

3. *Railroad bonds, indorsed by State; when negotiable, or commercial paper.*—Bonds issued by an Alabama railroad company, and indorsed by the State under the provisions of the act approved February 21st, 1870; payable "to ——— or bearer, in American gold coin, on presentation at the office or agency of said company in the city of New York," with coupons attached, payable in like manner; and containing a stipulation on each, that it "can be registered and made payable by transfer only on the books of said company,"—being governed by the general commercial law, "which must be presumed to prevail in New York, and which prevails here so far as not changed by statute, are clothed with all the attributes of commercial paper; they pass by delivery, and in the hands of a holder acquiring them for value before due, without notice, are not

[Reid v. Bank of Mobile.]

subject to equities with which they were affected as between the original parties, or while in the hands of a party holding them in trust."

4. *Commercial paper; rights of holder.*—When a negotiable instrument has been misapplied, or wrongfully parted with by one who held it in trust, a party claiming protection against the real or beneficial owner, as a *bona fide* holder, must show that he acquired it for a valuable consideration, in the usual course of trade, before maturity, without knowledge of any defect in the title of his transferror.

5. *Same; who is bona fide holder for value.*—It is the settled doctrine of this court, though contrary to the weight of authority elsewhere, that taking commercial paper as collateral security for a pre-existing debt, even though forbearance or indulgence be granted, is not a purchase for value; but, when it is taken in payment of such pre-existing debt, at its full value, the party becomes a purchaser for value, and is entitled to protection if not chargeable with notice.

6. *Same; notice to agent.*—Notice to an agent, in the transaction of his principal's business, operates as notice to his principal, whether a corporation or an individual; but, to charge a corporation with implied notice, on account of actual notice to an officer or agent, it must be shown that the notice was acquired by the officer or agent, not while engaged in the transaction of his private business, but while employed within the scope of his duty and power in and about the business of the corporation.

APPEAL from the Chancery Court of Mobile.

Heard before the Hon. H. AUSTILL.

The bill in this case was filed on the 28th July, 1875, by John Reid, jr., M. Temple Taylor, and Francis B. Clark, against the Bank of Mobile; and sought to establish and enforce an alleged trust in certain railroad bonds held by the defendant, on the ground that defendant was chargeable with notice of the trust, and of the violation of duty by the trustee, Cary W. Butt, deceased, in transferring or parting with the possession of the bonds. The bill alleged that, "at various times between November, 1871, and March, 1873, complainants, together with Charles Walsh, James Crawford, Robert W. Smith, Cary W. Butt, and Samuel G. Battle, for the purpose of aiding the Mobile and Alabama Grand Trunk Railroad Company, executed their joint notes to the amount of $41,000, payable to the order of F. B. Clark, president of said company; that such notes, being indorsed by said Clark as president, were negotiated at various banks in Mobile, one of them (for $10,000) being negotiated at the said Bank of Mobile; whereupon your orators, with the other makers of said notes, became and were jointly and severally liable to pay all of said notes, but it had been and was understood and agreed between them all that, as between themselves, they should be responsible and liable" in certain specified proportions. At the same time, as the bill further alleged, "the makers of said notes, being each severally liable for the full amount thereof, and being also the joint owners of sixty-six (66) one-thousand-dollar first-mortgage bonds of said railroad company, indorsed by the State of Alabama, each of said

[Reid v. Bank of Mobile.]

parties having an interest in said bonds in the same proportion as his agreed liability on said notes, it was mutually understood and agreed between them, that the said bonds should be turned over to said M. Temple Taylor, as trustee, to hold in trust for the mutual protection of the makers of said notes, and, in case they should so agree and direct, to sell said bonds, or such portion thereof as might be necessary, for the payment of said notes at maturity."

This was the trust alleged to have been created at first. The notes were not all paid at maturity, some being extended and renewed, and new notes with other parties taken for some; and these notes, the bill alleged, "were considered as in lieu of said notes so paid, and the makers thereof (being the same as the makers of said original notes) protected by said deposit of bonds, in the same manner as in said original notes." Eight of the bonds so placed in the hands of Taylor were, "by the common and express consent of all the parties interested, given up by him to said railroad company for its own uses, and, in lieu thereof, said company turned over to said Taylor, as trustee, nine one-thousand dollar bonds of the city of Mobile, indorsed by said railroad company; which said nine bonds were, by the consent of said parties interested, accepted by said trustee, subject to the trust aforesaid; and by the like common and express consent of said parties, said Taylor loaned to one Isaac Donovan, who was then a contractor on said railroad, forty-three (43) of said indorsed bonds, which said Donovan obligated himself to return, or to deliver other indorsed bonds in lieu thereof, to which he would soon thereafter become entitled for work done by him on said railroad." Afterwards, but at what time is not stated in the bill, "said M. Temple Taylor becoming embarrassed in his business affairs, it was agreed by and between the makers of said notes that Cary W. Butt, one of the said makers, should be substituted for said Taylor as the custodian and trustee of said bonds, upon the same conditions and trusts as they had theretofore been held by said Taylor; and thereupon, on the 27th September, 1872, said railroad company turned over to said Butt, on account of said Donovan, and by his order, forty-three (43) indorsed bonds of railroad company," the numbers of which are stated, "they being intended to replace the said bonds loaned to said Donovan as above stated, which he was then unable to restore; and early in November, 1872, the fifteen indorsed railroad bonds remaining in the hands of said Taylor," the numbers of which are stated, "and the said nine bonds of the city of Mobile, were turned over to said Butt; all of said fifty-eight (58) indorsed railroad bonds, and said nine city bonds, being delivered to said Butt, and by him received, as trustee, to and for the uses and trusts pertaining to the bonds

originally in the hands of said Taylor." On the 20th November, 1872, another note (for $6,043.95) was executed by the same parties; "and for their additional protection growing out of their liability for this increased joint indebtedness, two other indorsed railroad bonds," the numbers of which are stated, "and seven additional city bonds indorsed by said railroad company, were placed in the hands of said Butt, trustee as aforesaid, subject in all respects to the same trusts as the other bonds were then held by him; the liability of the makers on said last-mentioned note, and their interests in said bonds, being in the same proportion respectively as in and on the said original notes and bonds; and said Butt thus having in his hands, at this time, sixty of said indorsed railroad bonds, and sixteen of said city bonds, all subject to the said trust."

The above are the principal allegations of the bill, showing the creation of the trust, its terms, the substitution of Cary as trustee in lieu of Taylor, and the number and character of the bonds which were subject to the trust. The bill then stated in detail various transactions among the parties, relative to the notes and bonds, which require no special notice. On the 1st November, 1873, by renewals, interest, &c., the indebtedness of the makers of the secured notes amounted to more than $57,000; and one of the notes, for more than $7,000, was paid by Crawford, Walsh, Butt & Co., a firm which was the successor in business of Walsh, Smith, Crawford & Co., in each of which firms Butt was a partner. In the fall of 1873, the firm of Crawford, Walsh, Butt & Co., and the several partners composing that firm, became insolvent, and were adjudicated bankrupts; and the makers of the secured notes having also become insolvent, suits were brought against them by the holders of most of the notes. Afterwards, Taylor and Reid, acting for themselves and the other parties in interest, attempted to settle the indebtedness of the makers of the notes, with the bonds which had been placed on deposit in trust for their protection and indemnity; and settlements were effected with many of the holders of the notes. While these settlements were in progress, it transpired that Butt, the trustee, had deposited some of the bonds with the Bank of Mobile, as collateral security for debts due to the bank from the firm of Crawford, Walsh, Butt & Co.; but, that firm having acquired or paid some of the secured notes, it was agreed by the terms of settlement that seventeen of the bonds should be appropriated in satisfaction of that indebtedness. At that time, the First National Bank of Tuskaloosa held one of the secured notes, on which the amount due was nearly $6,000; and said bank was not a party to the settlement effected with other creditors. After this settlement was effected, and bonds were delivered up

by Butt to be appropriated according to its terms, " it was understood that there remained with said Butt eight of said original indorsed railroad bonds held by him, which were kept back and retained to settle the claim and notes held by said First National Bank of Tuskaloosa." On the 11th December, 1874, said bank at Tuskaloosa obtained a judgment against the complainants, as the only surviving solvent makers of said notes, for $6,351.61; and on this judgment, execution having been duly issued and levied, more than $1,500 was made out of Taylor's property, while the balance remained unsatisfied.

Butt died in July, 1874, leaving no property, and no administration was granted on his estate. The complainants made inquiry for said eight bonds after his death, but were unable to find them among his papers and effects; and on further investigation they discovered, as they alleged, "that said eight bonds, together with the other indorsed bonds unaccounted for by him, were by him converted from the purposes of said trust, and turned over by him to the said defendant corporation, the Bank of Mobile, and have been disposed of by the said bank for its own uses and purposes; and complainants charge, upon information and belief, that the following were the general circumstances of the transfer of forty two (42) of said bonds by said Butt to said bank: The said Charles Walsh had been the president, and the said James Crawford one of the most influential directors of said bank, for a long series of years; and the members of the firm of Crawford, Walsh, Smith & Co. controlled a large amount of the stock in said bank, and the said firm and its members had for years controlled the policy of said bank in its business transactions. During the administration of said Walsh as president, the various firms with which he had been connected, and the members of said firms, became largely indebted to said bank, and a large part of said indebtedness has been carried by renewals for several years. When said firm of Crawford, Walsh, Smith & Co. became embarrassed, in the fall of 1873, the stockholders of said bank became uneasy, on account of the close connection between said bank and said firm, and its large indebtedness, and instituted an investigation into the affairs of said bank. Before the investigation was had, and while the said Walsh was yet president, and the said James Crawford and Samuel G. Battle were directors, and to fortify themselves for the said investigation, the said C. W. Butt placed in said bank twenty-five (25) of said indorsed railroad bonds, as collateral for the then past-due indebtedness of said firm to said bank, and at the same time, or soon thereafter, placed also seventeen (17) other indorsed bonds of said railroad in said bank, as collateral to the note of said Crawford, Walsh, Butt, Battle, and your orators, for $10,211.03, then

[Reid v. Bank of Mobile.]

held by said bank, and which had been originally negotiated, renewed and held, without any collateral; and your orators charge that said forty-two (42) bonds were placed in said bank, and used by said Butt, without warrant or authority, and in violation of said trust, of which said bank had full knowledge; and that said bank subsequently took said bonds in settlement of the said past indebtedness of said firm, or its members, to said bank Your orators are not informed, and have no means of knowing the basis of said settlement, or the full particulars of the transfer of said bonds by said Butt to said bank, or the time when; but they aver that, before the death of said Butt, the said bank had received the following bonds," specifying the numbers of forty-two, "and afterwards the seventeen of said bonds placed by said Butt as collateral to the note for $10,211, as aforesaid, were used in settlement of said note; but the balance of said bonds, twenty-five in number, were used by said Butt in violation of his said trust, and with the full knowledge of the officers of said bank as to the character of the estate, title, property and trust of said Butt, and of your orators, in said bonds; of all which action of said Butt, as to these bonds last mentioned, your orators had no knowledge until after the death of said Butt. Nine of said bonds having been released to Crawford, Walsh, Butt & Co., as above stated, your orators now complain and seek relief as to" the remaining eight bonds, which were left in Butt's hands for the security and protection of the note held by the Tuskaloosa bank.

By interrogatories annexed to the bill, the defendant was required to answer, fully and particularly, as to all the circumstances under which it acquired the bonds—" particularly the time when said bonds were delivered to said bank, by whom delivered, and by whom received;" also, as to the various transactions between the bank and the firms named in which Walsh, Crawford, Butt and others were partners, their indebtedness to the bank, and how that indebtedness was paid or compromised; the relations which Walsh and Crawford sustained to the bank, &c. As to these several matters, the substance of the answer is contained in the following statements: "This defendant saith, that the said Charles Walsh was, and had been for several years prior to the 11th December, 1873, the president of this defendant corporation, and the said James Crawford was and had been one of its directors, and each of them owned a considerable number of shares of the stock of said corporation; and some of the other partners of the late firm of Crawford, Walsh, Smith & Co. were also owners of stock in said corporation; and the said Walsh as president, and said Crawford as director, during that time did have considerable influence in controlling the policy and business of said corpora-

tion ; and the said Walsh and Crawford individually, and the said late mercantile firms of Crawford, Walsh, Smith & Co. and Crawford, Walsh, Butt & Co., of each of which said Walsh and Crawford were partners, did respectively become indebted to said corporation in large amounts, and were so indebted on and prior to the 11th day of December, 1873. Some time during the fall of the year 1873, the said firm of Crawford, Walsh, Butt & Co. became embarrassed in its business ; and a meeting of the stockholders of this defendant corporation was called and held at the instance of the stockholders, and a committee was then appointed to investigate its affairs.    When said committee was appointed, said Walsh was president, and said Crawford and Samuel G. Battle were directors of said bank ; but some short time thereafter, to-wit, on the 11th December, 1873, said Walsh resigned his office of president, and also as one of the directors of said bank, and said Crawford also then resigned his office as one of the directors, and said resignations were accepted ; and since that date, to-wit, the 11th December, 1873, the said Walsh has not been either the president or a director of said bank, and the said Crawford has not been a director.    The said Samuel G. Battle continued to be a director until some time in January, 1874, but has not been one since that time.    Before and on said 11th December, 1873, said Crawford, Walsh, Butt & Co. were largely indebted to this defendant, for moneys obtained by them from this defendant by over-drafts of their account ; and being so indebted, they were called upon and required to pay their said indebtedness ; and afterwards, and after said Walsh had ceased to be a director of said bank, some time in the month of December, 1873, said Crawford, Walsh, Butt & Co. agreed to transfer and deliver to this defendant, and this defendant agreed to receive from them, in part payment of their said indebtedness, a number of bonds, among which were twenty-five bonds of the said railroad company, indorsed by the State, at a rate and price to be agreed on between them and this defendant ; and shortly afterwards, to-wit, on the 27th December, 1873, this defendant agreed with them to take, and did then take said twenty-five bonds, in part payment of said indebtedness, at the rate of fifty cents on the dollar, which was more than the market value of said bonds ; and after deducting said payment, and all other payments made to this defendant on account of said indebtedness, said Crawford, Walsh, Butt & Co. continued to be, and are now, largely indebted to this defendant.    Prior to that time, seventeen similar bonds had been delivered to this defendant, as collateral security for said note of $10,211.03 held by this defendant ; which said bonds were subsequently, by agreement of the parties, taken by this defendant in absolute payment of said

note; and said seventeen bonds, as also said twenty-five bonds, have since been exchanged by this defendant for other new bonds of said railroad company. This defendant does not know the numbers of said twenty-five bonds so delivered to it by said Crawford, Walsh, Butt & Co., nor whether they were the same bonds described in the bill; and defendant insists on due proof of the numbers and identity of said bonds, if material. This defendant denies that, at or before the time when it took any of said bonds as aforesaid, it had any notice, knowledge, information or belief, that the complainants, or either of them, had or claimed any right or interest whatever in said bonds, or any of them, or that said bonds had ever been held by said Butt upon or for the trusts or purposes alleged in said bill; and further answering, on information and belief, defendant denies that any of its officers had any such notice, knowledge, or information. This defendant further saith, that said 'twenty-five bonds so received by it were not due when so received by it, and were in the usual form of railroad coupon bonds; and this defendant is advised, and insists, that said bonds were, in their nature and legal effect, negotiable securities, which would pass by delivery to any *bona fide* purchaser for value, free and discharged from any secret trust therein. And for further defense to said bill, this defendant pleads, that it is a *bona fide* purchaser and holder of said bonds for a valuable consideration, before said bonds became due, and without any notice of the alleged interest or claim of the complainants in or to the same."

The bonds of the railroad company, as shown by an exhibit to the deposition of F. B. Clark, were in the following words, omitting the heading and the State indorsement: "Know all men by these presents, that the Mobile and Alabama Grand Trunk Railroad Company is indebted to——, or bearer, in the sum of one thousand dollars ($1,000), in American gold coin, for value received; which sum, the said Mobile and Alabama Grand Trunk Railroad Company hereby promises and agrees to pay to ——, or bearer, in American gold coin, on the presentation of this bond at the office or agency of the said company in the city of New York, on the first day of January, A. D. 1900; and the said Mobile and Alabama Grand Trunk Railroad Company hereby promises and agrees to pay interest on said sum, in American gold coin, at the rate of eight per-cent *per annum*, semi-annually, free from United States income tax, on the first day of January and July, in each and every year ensuing the date hereof, until said principal sum shall be paid, upon the presentation and delivery of the coupons hereto annexed, at the office or agency aforesaid, as they severally become due and payable. This bond is one of a series of like tenor and date, issued in consecutive numbers by the authority of the board of

[Reid v. Bank of Mobile.]

directors of the said Mobile and Alabama Grand Trunk Railroad Company, in accordance with its charter, for a loan of sixteen thousand dollars per mile of the railroad of said company; and the holder is entitled to the security to be derived from a deed of trust, bearing even date herewith, on the said railroad, and on the rights, property and franchises of every description of said company, conveying the same to David Solomon, of New York, and Charles Walsh and W. D. Dunn, of Mobile, Alabama, to secure the payment of said bonds and the interest on the same. The bonds, of which this is one, are indorsed on behalf of the State of Alabama, only as and after the company has, from time to time, finished, completed, and equipped as a first-class railroad, sections first of twenty miles, and afterwards of five miles each, of the road for which the bonds are issued, and to the extent of only sixteen thousand dollars per mile of such finished, completed, and equipped railroad; and upon all this there is a first lien, as well as the *guarantee* ( ? ) of the State for the payment of said indorsed bonds and their coupons. This bond can be registered and made payable by transfer only on the books of the said railroad company. In witness whereof," &c.

The bill was amended, after demurrer sustained for want of necessary parties, by making the First National Bank of Tuskaloosa a party complainant, and by bringing in as defendants the assignees in bankruptcy of Crawford, Walsh, and others. The chancellor held that the bill, as amended, contained equity, and showed a valid trust which the court would recognize and enforce; but, on final hearing, on pleadings and proof, he further held that the defendant bank was entitled to protection as a *bona fide* purchaser for valuable consideration without notice, and therefore dismissed the bill. From this decree the complainants appeal, and here assign it as error.

GAYLORD B. CLARK & F. B. CLARK, Jr., for appellants.—A valid trust in personal property may be created by parol.—Perry on Trusts, § 86; *Jones v. Shaddock*, 41 Ala. 262. The trust and its terms, and a violation thereof by the trustee, are clearly proved as alleged; and the trust funds are distinctly traced into the possession of the defendant bank. This makes out a *prima facie* case against the bank, and renders it liable for the trust funds so used and converted, unless it can discharge itself by some affirmative defense; and the exchange of the particular bonds for others does not affect this liability.—Perry on Trusts, §§ 217, 345, 828, 835; *Cook v. Tullis*, 18 Wallace, 332; *Jones v. Shaddock, supra*. The defense set up by the bank is a plea of *bona fide* purchase of the legal title, for valuable consideration, without notice, in the regular course of business; and the

[Reid v. Bank of Mobile.]

material questions are, whether this defense is sufficiently pleaded, and whether it is proved. To sustain this defense, the party pleading it must set out the particulars of his purchase; must show that he acquired by it the legal title, or an older equity; that his purchase was made in good faith, in the due course of business, for a valuable consideration actually paid; must positively deny notice, and negative every fact from which notice might be implied; and all these things must be both alleged and proved.—*Boone v. Chiles*, 10 Peters, 177; *Johnson v. Toulmin*, 18 Ala. 50; *Ledbetter v. Walker*, 31 Ala. 175; Perry on Trusts, § 219.

The plea and answer, when taken in connection with the specific allegations and charges of the bill, are clearly defective and insufficient to make out this defense; and the proof is even more defective, when considered in connection with the admitted facts. The bill charged that, at the time these bonds came into the possession of the bank, Walsh was its president, and Crawford an influential director; that Walsh had almost unlimited control over the affairs of the bank; that the bank held one of the secured notes; that Walsh had full knowledge of the trust, being himself one of the beneficiaries, while his partner was the trustee; and all these facts, from which notice will be implied, are substantially admitted. It is a legitimate inference from these facts, that these bonds were taken for the bank, from Butt, either by Walsh, or by Crawford; and this inference is strengthened by the defendant's persistent failure to answer the pointed interrogatory, "Who received these bonds on behalf of the bank?" In view of these circumstances, it is submitted, the bank is chargeable with notice at the time when it acquired the bonds.—*Duncan v. Joudan*, 15 Wallace, 165; Perry on Trusts, §§ 219, 828. If the bank once had notice, a mere change in its officers and agents, and the personal ignorance of the new officers, will not enable it to plead a want of notice.

The bonds were not taken by the bank for valuable consideration, nor in the regular course of business. They were first taken as collateral security for a pre-existing debt, as to which it is not even shown that forbearance or extension was granted; and were afterwards taken in part payment, at the rate of fifty cents on the dollar, when the debtors were known to be hopelessly insolvent.—*Fenouille v. Hamilton*, 35 Ala. 319; Perry on Trusts, §§ 217, 829. Nor did the bank acquire by the transfer the legal title to the bonds. It is not shown that the transfer was in writing, nor that it was entered on the books of the railroad company, in accordance with an express stipulation on the face of the bonds; and the bonds were not commercial paper, or negotiable and transferrable by delivery only, either by common law, or by statutory provision.—*Blackman v. Lehman*,

[Reid v. Bank of Mobile.]

*Durr & Co.*, 63 Ala. 547; Code, §§ 2094–95; Wait's Actions & Defenses, vol. 1, pp. 535, 573. The insertion of negotiable words, in an instrument which is not by law negotiable, does not change its legal character.—*Clark v. Farmers' Manufac'g Co.*, 15 Wendell, 256; 1 Wait's Act. & D. 561, 574. Nor are the rights of the parties in this case at all affected by the fact that the bonds and coupons are made payable in New York. The bonds were transferred here, by and between persons residing here; the trust was created here; the remedial jurisdiction of our courts is asked, and the rights of the parties are to be determined by our statutes.—*Lowry's Adm'r v. Western Bank*, 7 Ala. 121; 1 Dan. Neg. Instr. §§ 864, 899; 19 N. Y. 436.

WM. G. JONES, *contra.*—The bonds are, unquestionably, negotiable securities, and are not due until the year 1900; and a purchaser of such bonds in good faith, for valuable consideration, without notice of any secret trust, or other defect in the title of the transferror, takes them free and discharged of any such trust.—1 Dillon on Municipal Corporations, § 465, note 1, and cases cited; 1 Story's Equity, §§ 409, 411; Daniell on Negotiable Instruments, §§ 1492, 1499, 1500; 1 Wallace, 83. Taking them in payment, or part payment of a pre-existing debt, is a purchase for value.—Story on Bills, §§ 188, 192; 1 Parsons on Bills and Notes, 219, 221, 257; 2 *Ib.* 42; *Bank of Mobile v. Hall*, 6 Ala. 639; *Barney v. Earle*, 13 Ala. 112. The evidence clearly shows that the bank took these bonds in good faith, in part payment of an existing debt, and at more than their market value; and that this was done after Walsh had ceased to be either president or director, having previously resigned. Even if Walsh had been president at that time, his knowledge of the alleged trust, not being acquired in his official capacity, or in the transaction of business for the bank, would not charge it with notice.—*Terrell v. Branch Bank*, 12 Ala. 502; Story on Agency, §§ 140 *et seq.*

BRICKELL, C. J.—The evidence leaves no room for doubt that the bonds of the Mobile and Alabama Grand Trunk Railroad Company were held by Butt as a trustee to secure and protect the appellants from liability on the promissory note to which they were parties, held by the First National Bank of Tuskaloosa. It was a breach of duty, and a violation of the confidence reposed in him, without the consent of the appellants, to apply these bonds for any other purpose than that of relieving them from liability on that note. Pledging them as collateral security, or making an appropriation of them for the payment of his own debt, or the debts of a partnership of which

14

he was a member, was a wrongful conversion, rendering him chargeable with the value of the bonds at the time of such conversion. It is the right of the appellants to follow the bonds, or the proceeds into which they may have been changed, in the hands of all others than purchasers for a valuable consideration without notice of the trust, and into the hands of such purchasers, if the bonds are not to be taken as negotiable paper.

The bonds are payable to bearer, as are the coupons attached for the interest semi-annually, at the office or agency of the railroad company in the city of New York; and in this respect differ from the bonds of the city of Troy, which were the subject of litigation in the case of *Blackman v. Lehman, Durr & Co.*, 63 Ala. 547, which were payable in this State. It was, therefore, with a view to the law of New York, and with the intention that law should govern and control as to the character and operation of the bonds, it must be intended they were issued. By the general commercial law, which, it is presumed, prevails in New York, and which prevails here, so far as not changed by statute, bonds of this character, when expressed in negotiable words, are clothed with all the attributes of commercial paper—they pass by delivery, and in the hands of a holder acquiring them for value before due, without notice, are not subject to equities with which they were affected as between the original parties, or while in the hands of a party holding in trust.—2 Dan. Neg. Inst. §§ 1500 *et seq.* They derived much of their value from being impressed with this legal character and their capacity of passing by mere manual delivery. Deprived of this character and capacity, they would not subserve the purposes for which they are generally issued,—the convenient and speedy raising of money for the promotion and accomplishment of the objects of the corporation.

When, however, it is shown that a negotiable instrument has been misapplied—that it has been parted with wrongfully, by one having its custody, and in fraud of the rights of the true owner—the party claiming protection as a *bona fide* holder, as against the true owner, must show that he acquired it for a valuable consideration, in the usual course of trade, without knowledge of any defect or infirmity in the title of his transferror. *Ross v. Drinkard*, 35 Ala. 434. When that appears, he has a valid title, which can not be defeated by the fraud of the transferror, nor by equities affecting his title.

It is not necessary to inquire, whether the appellee could be regarded as a *bona fide* holder, entitled to protection against the equities of appellants, so long as these bonds were held as collateral security for a pre-existing debt. In this State, it has been for a long time a settled doctrine, that taking commercial paper as collateral security for a pre-existing debt, though in-

[Reid v. Bank of Mobile.]

dulgence or forbearance is granted, will not constitute a purchaser for value.—*Fenouille v. Hamilton*, 35 Ala. 319, *and authorities cited*. We are aware that this doctrine is in conflict with the great weight of authority, and upon its discussion we do not now enter. Subsequently, the bonds were taken in payment of the debt, at their full value. Receiving negotiable paper in payment of a precedent debt, can not be distinguished from purchasing it with money, or taking it in payment of property sold; and when it is so received, it is taken in the usual course of trade, and the holder is entitled to protection. *Bank of Mobile v. Hall*, 6 Ala. 639.

It is only notice of the equity of the appellants, or notice of the infirmity of the title of the transferror, which will now affect the title of the appellee. It is true that Walsh, the president, and Crawford, a director of the bank, when these bonds first came to its possession as collateral security, had full knowledge that they were held in trust by Butt, and of the equities of the appellants now asserted. But it is apparent they did not acquire such knowledge while acting in their respective official capacities, or while transacting business for the bank. It was acquired in the course of business, and in transactions, with which the bank had no concern. There was no communication of it to any officer of the bank, nor was there of any fact which would have excited inquiry or suspicion. Notice to an agent, in the course of transactions for which he was employed, operates as notice to the principal; and the rule is as applicable to corporations as to individuals.—*Lucas v. Bank of Darien*, 2 Stew. 321; *Terrell v. Br. Bank of Mobile*, 12 Ala. 502; *Mundine v. Pitts*, 14 Ala. 84; *Pepper v. George*, 51 Ala. 190. It is not the private individual knowledge of the officer of a corporation, acquired in the transaction of his own business, while dealing as if he had no official relation to the corporation, that will operate as notice.—Ang. & Ames Corp. §§ 305, 309; *Terrell v. Br. Bank of Mobile, supra*. It is only knowledge acquired while he is engaged within the scope of his duty and power in the business of the corporation, that can be imputed as notice to the latter.

Such being the aspect of the case, we concur with the chancellor, that the appellee is entitled to protection as a holder for value, against the equity of the appellants; and the decree must be affirmed.